Brendan J. Begley (SBN 202563)
W. Scott Cameron (SBN 229828)
**weintraub tobin** chediak coleman grodin
LAW CORPORATION
400 Capitol Mall, 11th Floor
Sacramento, California 95814
Telephone:     916.558.6000
Facsimile:     916.446.1611
Email: BBegley@weintraub.com
          SCameron@weintraub.com

Attorneys for Plaintiff
SmileDirectClub, LLC

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMILEDIRECTCLUB, LLC, a Tennessee limited liability company, | Case No.: |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY RELIEF** |
| TRACY A. MONTEZ, Ph.D.; ALAN FELSENFELD, M.A., D.D.S.; JOANNE PACHECO, R.D.H., M.A.O.B.; LILIA LARIN, D.D.S.; STEVEN CHAN, D.D.S.; JONI FORGE, D.D.S.; MEREDITH MCKENZIE, Esq.; ANGELITA MEDINA, M.H.S.; SONIA MOLINA, D.M.D., M.P.H.; ROSALINDA OLAGUE, R.D.A., B.A.; YOGITA THAKUR, D.D.S., M.S.; and JAMES YU, D.D.S., M.S., each individually and in their official capacities as Officers and/or Members of the Dental Board of California, and DOES 1 through 10, | |
| Defendants. | |

{3996352.DOCX:}

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff SmileDirectClub, LLC brings this Complaint against Defendants Tracy A. Montez, Ph.D., individually and in her official capacity as Executive Officer of the Dental Board of California; Alan Felsenfeld, M.A., D.D.S.; Joanne Pacheco, R.D.H., M.A.O.B.; Lilia Larin, D.D.S.; Steven Chan, D.D.S.; Joni Forge, D.D.S.; Meredith McKenzie, Esq.; Angelita Medina, M.H.S.; Sonia Molina, D.M.D., M.P.H.; Rosalinda Olague, R.D.A., B.A.; Yogita Thakur, D.D.S., M.S.; and James Yu, D.D.S., M.S., each individually and in their official capacities as Officers and Members of the Dental Board of California; as well as DOES 1–10, inclusive, and alleges:

**INTRODUCTION**

1.    Telehealth has become an increasingly popular choice for seeking and obtaining medical treatment across the globe. Especially since the COVID-19 pandemic, both medical professionals and consumers have embraced telehealth as an advantageous modality to obtain medical care, and laws across the country have been passed to enable the practice of telehealth with corresponding insurance coverage. In 2011, the California legislature enacted a statute permitting telehealth in California. *See* Cal. Bus. & Prof. Code § 2290.5. The basic premise of that law and others like it is that medical professionals can provide care without the requirement of an in-person office visit.

2.    Plaintiff SmileDirectClub, LLC ("SmileDirect") created an innovative method for using a telehealth platform to expand access to orthodontic treatment to underserved population segments. More than 85% of the U.S. population suffer from some form of misaligned teeth. Yet, before 2016, less than 1% of the population could access care to address this oral healthcare problem. Dentists and orthodontists treat consumers with misalignment or "malocclusion" of their teeth. One method of treating malocclusions is through prescription of clear aligner therapy, an alternative to traditional wire and bracket braces. Clear aligner therapy uses a series of tight-fitting, custom-made mouthpieces that slip over the teeth. Each aligner uses carefully calibrated force to move the teeth to a new position. The series of aligners, used one after the other, move the teeth

///

///

weintraub **tobin** chediak coleman grodin
law corporation

into the desired position. Clear aligner therapy has many advantages over wire braces, including less constant pressure on the teeth, the ability to enable better daily flossing, and being more appealing cosmetically.

3.    SmileDirect is an oral care company that provides non-clinical, administrative dental support organization services ("DSO Services") to independent dental practices ("Affiliated Dental Practices"). State-licensed dentists and orthodontists contracted by the Affiliated Dental Practices ("Treating Doctors") can access SmileDirect's DSO Services through their Affiliated Dental Practice. Treating Doctors use SmileDirect's DSO Services to support and enable their treatment of patients with clear aligner therapy across the United States, including in California.

4.    SmileDirect's DSO Services include a proprietary and innovative telehealth platform—SmileCheck—which allows Treating Doctors and their patients to connect remotely through a web-based portal. Because (like other state's laws) California's telehealth law (Cal. Bus. & Prof. Code § 2290.5) and dentistry laws (Cal. Bus. & Prof. Code § 1600 et seq.) do not require an in-person office visit, SmileCheck allows the Treating Doctors to offer a fully remote model for the delivery of orthodontic clear aligner treatment, which SmileDirect pioneered. SmileDirect's DSO Services allow Affiliated Dental Practices and Treating Doctors to reach large numbers of consumers who otherwise would lack reasonable, convenient, and affordable access to teeth-straightening services. Consumers can save up to 60 to 70 percent on their clear aligner therapy from Affiliated Dental Practices as compared to traditional orthodontic treatments offered by brick-and-mortar dental or orthodontic practices using a traditional in-office delivery model.

5.    The accessibility and affordability generated by SmileCheck and the telehealth model has disrupted the traditional orthodontia market, which delivers products and services only through brick-and-mortar dental offices and during limited office hours, with higher costs to consumers. Until recently, dentists and orthodontists primarily competed in small, local markets. However, SmileDirect's non-clinical, administrative DSO Services allow Treating Doctors, licensed in the state where the consumer receives treatment, to treat consumers in remote geographic areas without the loss of chair time during the limited office hours that they are open. The increased competition facilitated by SmileDirect drives down prices, increases access, and

1    enhances consumer choice. As a result, trade associations made up of competitors and competitors

2    within the traditional model have perceived SmileDirect as an existential competitive threat to

3    traditional dentists and orthodontists' ability to continue to generate substantial fees through their

4    traditional delivery model at artificially inflated prices.

5        6.    In response to this perceived competitive threat, and at the urging of prominent trade

6    associations comprised of competitors, the Dental Board of California ("Board") pursued an

7    aggressive, anti-competitive campaign of harassment and intimidation against SmileDirect,

8    Affiliated Dental Practices, Treating Doctors, and the competition that they represent. This

9    campaign has sought to protect the economic interests of the traditional orthodontia market—

10    including the practices of many of the Board members—rather than public health, welfare, or

11    safety. The anti-competitive campaign began with raids on SmileDirect's mobile and permanent

12    locations.

13        7.    However, recognizing that SmileDirect and the Treating Doctors who use

14    SmileDirect's DSO Services comply with California law governing the practice of dentistry, the

15    Board shifted its efforts in targeting the perceived competitive threat. The Board (along with the

16    trade associations and other direct competitors of SmileDirect) sought to influence the state

17    legislature to change California law in a way that would target dentists who use a telehealth model

18    like SmileDirect's. The Board pushed for laws that would have required all consumers seeking

19    clear aligner therapy to go into a dentist's office for an in-person visit and to have a mandatory

20    radiograph (which exposes the consumer to radiation, the effects of which accumulate from

21    multiple sources over time) taken before clear aligner therapy can be prescribed, regardless of

22    whether the radiograph was clinically needed. The Board's effort to squelch perceived competition

23    through legislation failed.

24        8.    Because of the Board's abusive conduct, SmileDirect, an Affiliated Dental Practice,

25    and a Treating Doctor sued the Board members, its executive director, and its investigator, asserting

26    claims under the Sherman Antitrust Act, civil rights claims under 42 U.S.C. § 1983, and a claim

27    under California's Unfair Competition Law (the "Antitrust Action").

28    ///

9.     After its failed effort to change the law, and during the Antitrust Action, the Board tried another approach in its campaign against telehealth. For the first time, in 2023, the Board has taken the position that certain features of telehealth models for providing clear aligner therapy—including the defining feature that doctors prescribe aligner therapy remotely—violate various provisions of the California Dental Practice Act (Cal. Bus. & Prof. Code § 1600 et seq.) and corresponding regulations. Specifically, the Board contends that (1) dentists cannot prescribe clear aligner therapy without an in-person visit with the consumer, (2) the taking of photographs using a digital scanner is a "diagnostic procedure" requiring, before the taking of the photographs, a preliminary in-person oral exam by a licensed dentist, (3) unlicensed dental assistants cannot use a digital scanner to take photographs of a consumer's mouth and teeth without direct supervision by an onsite licensed dentist, and (4) dentists cannot use the assistance of non-dentist technicians to "develop" a dental treatment plan.

10.     The Board's position, if accepted, would eliminate all the benefits of the telehealth innovations in orthodontia—including the lower costs and the sweeping strides in increased access to care. To put those benefits into perspective, in the six years SmileDirect's telehealth platform has enabled dentists to provide remote treatment to California patients, SmileDirect has saved those California patients over $640 million. All those savings—on average approximately $3,000 per patient—go away if the Board's position is accepted. And the orthodontia industry would revert back to when only a small fraction of the population has access to treatment for misaligned teeth. The ramifications of the Board's position go beyond telehealth models. The Board's novel re-interpretation of California law would impose burdens that not even traditional brick-and-mortar practices follow. The changes that would be required in all dental practices would generate increased costs in the entire industry, with those costs being passed along to patients.

11.     Recognizing the momentous impact of the Board's view of the California Dental Practice Act, the parties to the Antitrust Action settled the dispute by agreeing that the action would be dismissed without prejudice to the refiling of the action after the parties obtain a judicial determination of the Board's positions under California law. To achieve that end, the parties' agreement called for SmileDirect to file this lawsuit seeking declaratory relief.

**THE PARTIES**

12.     Plaintiff SmileDirect is a Tennessee limited liability company with its headquarters in Nashville, Tennessee. SmileDirect has been duly registered and authorized to conduct business in California since March 29, 2017 (Entity No. 201709810114). The sole member of SmileDirect is SDC Financial LLC, a Delaware-chartered limited liability company. The members of SDC Financial LLC are: (1) SmileDirectClub, Inc., a Delaware-chartered corporation with its headquarters in Nashville, Tennessee; (2) two single-member limited liability companies, whose members are individuals who do not reside in California; (3) various individuals, none of whom resides in California; and (4) various trusts—none of the trustees for those member trusts resides in California.

13.     Defendant Tracy A. Montez, Ph.D., serves as the Executive Officer of the Board. On information and belief, she resides in Sacramento County, California.

14.     Defendant Alan Felsenfeld, M.A., D.D.S., serves as President of the Board. On information and belief, he resides in California.

15.     Defendant Joanne Pacheco, R.D.H., M.A.O.B., serves as Vice President the Board. On information and belief, she resides and works as a registered dental hygienist in Fresno County, California.

16.     Defendant Lilian Larin, D.D.S., serves as Secretary of the Board. On information and belief, she resides and practices dentistry in California.

17.     Defendant Steven Chan, D.D.S., serves as a member of the Board. On information and belief, he resides and practices dentistry in Alameda County, California.

18.     Defendant Joni Forge, D.D.S., serves as a member of the Board, and previously served as President of the Board. On information and belief, Forge resides in California.

19.     Defendant Meredith McKenzie, Esq., serves as a member of the Board. On information and belief, she resides in Santa Clara County, California.

20.     Defendant Angelita Medina, M.H.S., serves as a member of the Board. On information and belief, she resides in California.

///

**weintraub tobin** chediak coleman grodin
law corporation

21.     Defendant Sonia Molina, D.M.D., M.P.H., serves as a member of the Board. On information and belief, Molina resides in California.

22.     Defendant Rosalinda Olague, RDA, B.A., serves as a member of the Board. On information and belief, she resides in California.

23.     Defendant Yogita Thakur, D.D.S., M.S., serves as a member of the Board. On information and belief, she resides in San Mateo County, California.

24.     Defendant James Yu, D.D.S., M.S., serves as a member of the Board. On information and belief, he resides and practices dentistry in Alameda County, California.

25.     On information and belief, the Board members, Montez, and each of them, were or are the agents, employees, employers, officers, directors, managers, partners, representatives, predecessors, successors, transferees, licensees, assigns, or servants of each of the other defendants named herein, and at all relevant times alleged herein were acting within the course and scope of that relationship, agency, or employment, with full notice, consent, and ratification of the acts or omissions of each of the other defendants.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because no member of SmileDirect, including the members of its member, is a citizen of the same state as any defendant, and the amount in controversy and object of the litigation exceed $75,000.

27.     This Court has personal jurisdiction over each of the Board members, Montez, and the Doe Defendants because, on information and belief, they each reside in California, which subjects them to the general jurisdiction of California courts, and by extension this Court. *See Milliken v. Meyer*, 311 U.S. 457, 462–63 (1940).

28.     This Judicial District is a proper venue for this lawsuit under 28 U.S.C. § 1391(b)(1) because all defendants reside in California and, on information and belief, at least two named defendants (Montez and Pacheco) reside within this Judicial District. This Judicial District is also a proper venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the dispute occurred in this Judicial District, which is where the Board is headquartered.

*///*

**BACKGROUND**

**I.     SmileDirect's Business Model Disrupts Traditional Brick-and-Mortar Dentistry**

29.     In addition to marketing and selling a suite of premium oral health care products, SmileDirect has revolutionized the non-clinical administration of dental care in the United States with its innovative telehealth platform called SmileCheck—one of the administrative DSO Services available to Affiliated Dental Practices—and the provision of clear aligners to consumers through fully remote care by the Treating Doctors. SmileCheck offers a proprietary, web-based portal that remotely connects consumers with Treating Doctors licensed in the consumer's state of residence over the internet.

30.     The process for consumers to obtain clear aligner therapy from a Treating Doctor through SmileDirect's platform involves four steps.

*Step 1: Consumer provides information for Treating Doctors to evaluate*

31.     Consumers interested in clear aligner therapy have three options for starting the process: (*A*) by visiting a brick-and-mortar retail store known as a SmileShop® store; (*B*) by using SmileDirect's website to request an at-home impression kit prescribed by a Treating Doctor; or (*C*) by visiting the office of a doctor participating in SmileDirect's Partner Network Program or Care Plus, which may already be the consumer's regular dentist.

32.     *Option A*. If a consumer decides to start the process by visiting a SmileShop store, the consumer electronically provides health and dental history information, identifies their chief complaint about their smile, and completes an informed consent form, all of which may be completed by the consumer either at the SmileShop store or before the SmileShop appointment through SmileDirect's website. At the SmileShop appointment, a trained technician takes traditional photographs of the consumer's teeth and gums, and scans the consumer's mouth and gums using a sophisticated digital scanner that does not have any harmful emissions whatsoever (unlike a radiograph). These digital scanners feature an oral scanner wand with a sophisticated tiny camera on the tip. The technician moves the wand around the consumer's mouth, and it captures several thousands of picture frames per second. The scanner lets the technician know whether the full image has been captured. The scanner stores these picture frames digitally and feeds them into a

**weintraub tobin** chediak coleman grodin
law corporation

computer program that generates a high-resolution, interactive three-dimensional (3D) image of the consumer's teeth and gums.[1] The U.S. Food and Drug Administration ("FDA") approved these scanners, and the FDA does not require a licensed dental professional to operate them or to be onsite during operation. All the information collected at the SmileShop or in advance of the SmileShop appointment is then uploaded to SmileDirect's SmileCheck portal for the trained treatment setup technicians to review and then for the subsequent analysis by a Treating Doctor.[2]

33.     Traditional brick-and-mortar practices use similar digital scanners. The scanners are non-invasive and their use is so simple and straightforward that traditional brick-and-mortar practices routinely task unlicensed staff members with taking the scans.[3] These non-invasive digital scans present a distinct patient-focused advantage over radiographs, as it is well documented in scientific studies that the effects of exposure to radiation accumulate from multiple sources over time and pose risks to patients.

34.     *Option B.* If a consumer decides to start the process by requesting a doctor-prescribed impression kit from SmileDirect's website, an affiliated dental laboratory in Tennessee mails the impression kit to the consumer under orders from a licensed dentist. The kit includes impression trays, putty, a "Smile Stretcher," gloves, and easy-to-follow instructions that guide the consumer through the process of creating clear impressions. Using the materials from the kit, the consumer makes impressions and takes digital photographs of their teeth and gums for analysis by the Treating Doctor. The consumer also provides health and dental history information, identifies their chief complaint(s), and completes informed consent forms online through the SmileDirect website. The consumer then sends their impressions to SmileDirect's affiliated dental laboratory where trained technicians review the impressions to determine whether they are sufficient to create

---

[1] More than 1.5 million consumers have had a scan taken during this initial, information-gathering step, all without a single consumer complaint about the scan.

[2] California consumers are also separately asked if they have a recent oral x-ray. The Treating Doctor ultimately determines whether the digital frames captured by the scanner are equivalent to bone imaging suitable for orthodontia or if they would prefer a traditional radiograph. If the Treating Doctor would like to see an x-ray, the consumer is asked for a copy of the recent x-ray (if there is one) or asked to have an x-ray taken.

[3] A member of a dental board from another state testified under oath that a six-year-old could operate one of these digital scanners.

COMPLAINT FOR DECLARATORY RELIEF

a 3D image of the consumer's teeth and gums. If the impressions are sufficient, the 3D image is created and uploaded, along with the other information and photos provided by the consumer, to the SmileCheck portal for analysis by a Treating Doctor. If the impressions are insufficient, SmileDirect has the dental lab send the consumer another kit free of charge.

35.    The review of the impressions by the dental lab to create the 3D images for the Treating Doctor is the same process used in a traditional brick-and-mortar setting.

36.    *Option C*. A consumer can start the process by going to any of the dentists or orthodontists in the SmileDirect Partner Network that is convenient for the consumer, including their own regular dentist if that dentist is already part of the Partner Network Program. At the Partner Network dentist's office, traditional photographs are taken of the consumer's teeth and gums, along with either the same sophisticated digital images that are taken at the SmileShops or a physical impression, depending on the preferences of the dentist. If the dentist elects a digital scan, the scan is used to generate the interactive 3D image, just like in the SmileShop option (Option A). If the dentist elects to use physical impressions, the impressions are sent to the dental lab to create the 3D image, no differently than the doctor-prescribed kit option (Option B). The Partner Network practice will also take traditional photographs and the consumer provides dental and health history, executes informed consent, and identifies their chief complaint(s) about their smile. All this information collected from the consumer is then uploaded by the Partner Network dental practice to the SmileDirect website for review first by trained treatment setup technicians and then by the Treating Doctor.

*Step 2: Dental lab technicians draft a proposed treatment plan for review by a Treating Doctor*

37.    In the second step of the process, the consumer's file, including the 3D images, is sent to SmileDirect's highly trained dental-lab technicians, who work under direct supervision of over 60 dentists and orthodontists for an extra level of quality assurance. The lab technicians use sophisticated and proprietary treatment-set-up software—which the FDA has cleared under section 510(k) of the Food, Drug and Cosmetic Act—to propose a customized draft treatment plan for each consumer. The treatment setup software and model of having lab technicians creating the initial

weintraub **tobin** chediak coleman grodin
law corporation

draft treatment plan is standard and well accepted in the clear aligner therapy industry. This type of draft treatment plan is a proposal that contains a potential course of movement of the teeth to address the consumer's chief complaint. Once the draft treatment plan is completed and has undergone a quality assurance check, it is uploaded into SmileCheck along with the consumer's other information.

38.    Like under SmileDirect's model, traditional brick-and-mortar providers of clear aligner therapy, including Invisalign, also use trained lab technicians to prepare a proposed treatment plan to be reviewed by a treating doctor. One difference between SmileDirect's treatment setup lab and those used by other providers (such as Align Technology) is that the quality assurance review at the  SmileDirect treatment setup facility is conducted by licensed dentists and orthodontists on staff at the dental laboratory, which provides an added layer of quality assurance and consumer protection that other treatment setup labs do not offer.

*Step 3: A Treating Doctor conducts an initial comprehensive evaluation to determine whether the consumer is an appropriate candidate for clear aligner therapy and, if so, crafts a treatment plan.*

39.     In the third step, the Treating Doctor conducts an initial comprehensive evaluation to determine whether the consumer is an appropriate candidate for clear aligner therapy using a telehealth platform. Each Treating Doctor is licensed to practice dentistry in the state in which the consumer resides. All Treating Doctors have at least four years of experience providing clear aligner therapy in traditional brick-and-mortar dental offices.

40.    To evaluate the consumer's candidacy for clear aligner therapy, the Treating Doctor examines the consumer by reviewing and evaluating the information uploaded to the Provider Portal of the SmileCheck platform, including the 3D images created by the impressions or scanner, the traditional photographs of the teeth and gums, the medical and dental history, the chief complaint, the consumer's attestation of informed consent, and whatever other information or documentation the Treating Doctor has requested and been provided.

41.    If the Treating Doctor determines, in his or her independent professional judgment, that the consumer needs more complex treatment to address their chief complaint, or presents with

other conditions that the Treating Doctor believes makes them not a viable candidate, the Treating Doctor will inform the consumer that they are not a good candidate for clear aligner therapy using the SmileDirect platform. If, in the Treating Doctor's professional judgment, more information or clearances are needed to determine whether the consumer is a viable candidate (such as a radiograph or periodontal clearance), the Treating Doctor will inform the consumer and will not make a final determination until the necessary information or clearance has been obtained.

42. If the Treating Doctor has all the needed information and determines that the consumer is an appropriate candidate for clear aligner therapy using SmileDirect's platform, the Treating Doctor then reviews the draft treatment plan. The Treating Doctor has complete discretion to approve the draft treatment plan, modify it, or reject it, based on the Treating Doctor's independent professional judgment.

43. Once the treatment plan has been approved by the Treating Doctor, the consumer is notified of the name and license number of their Treating Doctor and provided with a detailed explanation of the treatment plan, including 3D images depicting anticipated teeth movement. Consumers can discuss the treatment plan with the Treating Doctor to make sure they understand the plan and have confidence that it will address their chief complaint. If the consumer elects to move forward with the treatment, the Treating Doctor submits a prescription for manufacturing of the aligners pursuant to the approved treatment plan. SmileDirect then fulfills the prescription by arranging for the aligners to be manufactured by, and shipped from, a manufacturing facility operated by SmileDirect's affiliate, Access Dental Lab, LLC, which is certified by and registered with the FDA.

*Step Four: The Treating Doctor oversees the consumer's use of clear aligner therapy.*

44. In the fourth and final step, if the consumer has chosen to move forward with clear aligner therapy, the Treating Doctor treats the consumer as his or her patient. After receiving the clear aligners prescribed by the Treating Doctor and detailed instructions on their use and care, the consumer puts on the first set of aligners and then uploads onto SmileCheck photos of the aligners on their teeth for the Treating Doctor to review. The consumer is instructed to check in with their Treating Doctor through SmileCheck at least once every 60 days (or more frequently, if requested

weintraub **tobin** chediak coleman grodin
law corporation

by either the Treating Doctor or the consumer) so that the Treating Doctor can monitor the consumer's progress and determine whether any midcourse corrections or refinements are necessary. The consumer can also request a midcourse correction during treatment, or a refinement at the end of treatment, if they are unhappy with their results. Any midcourse correction or refinement request must be approved by the Treating Doctor. Consumers can also use the SmileCheck platform to interact with their Treating Doctor at any time. Upon completion of their clear aligner therapy, consumers can purchase doctor-prescribed retainers to maintain their treatment results.

45.    Throughout this four-step process, the Treating Doctor maintains sole responsibility for all clinical aspects of the consumer's care. SmileDirect's involvement is limited to providing administrative, non-clinical DSO Services, such as billing and collections, recordkeeping, arranging for the manufacture and shipment of clear aligners, and the collection of consumer information for review by the Treating Doctor—the same types of tasks performed by administrative and support staff in a traditional in-office setting. At no point does SmileDirect treat consumers or make any clinical decisions.

46.    More than 90% of the Treating Doctors maintain their traditional dental offices in addition to providing treatment using SmileDirect's telehealth platform. Consumers receive the same level of care from their Treating Doctors, but receiving that care through SmileDirect's telehealth platform results in more affordable, accessible, and efficient care than traditional, in-office orthodontic treatment.

**II.    SmileDirect's Business Model Increases Access and Decreases Cost**

47.    Before SmileDirect's innovative business model, only one percent of the global population received orthodontic treatment each year, even though nearly 85 percent of the global population could benefit from such treatment. SmileDirect helps its Affiliated Dental Practices and their Treating Doctors provide affordable care to populations underserved by traditional dentists and orthodontists operating in brick-and-mortar offices. By combining its SmileCheck platform with direct-to-consumer delivery, SmileDirect's business model provides a solution to two of the most significant challenges in dental care: access and cost.

48.    Consumer access to orthodontists has been one of the largest problems in expanding availability of orthodontic treatment. Most consumers are unwilling to travel more than a few miles or across county or state lines to obtain orthodontic treatment. Approximately 60 percent of counties in the United States do not even have an orthodontic office. Consumers with mild-to-moderate malocclusion therefore often cannot obtain the treatment that they need without traveling significant distances to find a brick-and-mortar office. The need to make this journey—and to take time off from work or school to attend appointments scheduled during "regular business hours" at a brick-and-mortar dental office—on a repeated basis only exacerbates the burden.

49.    Cost represents another significant obstacle to consumers receiving orthodontic treatment. The average cost of orthodontic treatment for consumers with mild-to-moderate malocclusion in a traditional dental office totals about $5,000 to $8,000. And many traditional dental and orthodontic practices do not offer financing options for their consumers, but rather require full payment up front. Many consumers who would benefit from treatment simply cannot afford these payments.

50.    SmileDirect has helped to solve the problems of access and cost by developing its telehealth platform, delivering clear aligners directly to consumers, significantly reducing the price point, and offering financing. By significantly reducing overhead costs compared to traditional brick-and-mortar offices, Affiliated Dental Practices have been able to charge consumers substantially less than traditional brick-and-mortar offices. The SmileCheck platform allows consumers to connect with Treating Doctors at a time convenient for them, often from the comfort of their own home.

51.    SmileDirect's model thus has generated many benefits for consumers, including:

a.    Reduced Costs: Clear aligner therapy prescribed through SmileDirect's telehealth platform costs a consumer approximately $2,250, which on average saves a consumer approximately $3,000 compared to traditional orthodontic treatments offered in brick-and-mortar offices.

b.    Greater Convenience: Consumers can begin the process in their home or in a comfortable, convenient, and familiar retail location, rather than in a

weintraub tobin chediak coleman grodin
law corporation

traditional brick-and-mortar dental or orthodontic office. Consumers also can save substantial time and expense during their course of treatment by using the telehealth platform to avoid multiple office visits. Traditional models generally require between 10 to 15 in-office visits—often limited to "regular business" hours—over the course of between 12 to 24 months of treatment.

      c.     <u>Increased Access</u>: The telehealth platform has expanded access for consumers located in areas not adequately served by traditional brick-and-mortar dental and orthodontic offices.

      d.     <u>Enhanced Consumer Choice</u>: SmileDirect's business model gives consumers more options for their dental care, allowing them to choose traditional orthodontia offered at brick-and-mortar dental offices, a fully remote treatment offered by Affiliated Dental Practices that use SmileDirect's model, and more recently, a hybrid approach through its Partner Network offering.

52.     SmileDirect's telehealth platform also benefits Treating Doctors by enabling them to transform their practices into multi-state or nationwide practices, all without having to deal with the associated non-clinical administrative burdens. Treating Doctors who reside in one state but are licensed in multiple states can provide dental care to consumers in all the states where they are licensed using the SmileCheck platform.

53.     SmileDirect has experienced tremendous growth since its founding in 2014. SmileDirect and its Affiliated Dental Practices have opened over 120 SmileShop stores around the world and helped over 2 million consumers achieve a smile they love. On a national scale, SmileDirect and its Affiliated Dental Practices have been able to use the SmileShops and doctor-prescribed impression kits to collect information from millions of consumers without any incident or complaint of physical injury, infection, or other adverse outcome associated with that collection.

54.     The telehealth platform and direct delivery to consumers has disrupted and continues to disrupt traditional models of orthodontia delivery. The entrance of direct-to-consumer telehealth alternatives into the market makes the clear aligner market more competitive for dental

weintraub tobin chediak coleman grodin
law corporation

professionals. This increased competition means that dental professionals beholden to the traditional practice model must compete harder to attract and retain consumers, including lowering their prices and offering more convenient hours.

**III.    SmileDirect, its Affiliated Dental Practice, and Treating Doctors Operate Lawfully in California Since 2017**

55.    In 2011, the California legislature adopted a "telehealth" statute allowing, but imposing certain restrictions on, the provision of telehealth services, which the statute defined as "the mode of delivering health care services and public health via information and communication technologies to facilitate the diagnosis, consultation, treatment, education, care management, and self-management of a patient's health care." Cal. Bus. & Prof. Code § 2290.5. The basic requirement of the telehealth law is that "[b]efore the delivery of health care via telehealth, the health care provider initiating the use of telehealth shall inform the patient about the use of telehealth and obtain verbal or written consent from the patient for the use of telehealth as an acceptable mode of delivering health care services and public health." *Id.*

56.    Since SmileDirect began doing business in California in 2017, SmileDirect, the Affiliated Dental Practices, and Treating Doctors have complied with California's telehealth law by, among other things, obtaining prior informed written consent from each consumer before providing the services delivered through SmileDirect's telehealth model.

57.    Since 2017, SmileDirect has enabled more than 216,000 consumers in California to access care. Those consumers have saved approximately $640 million on the cost of treatment as compared to the average cost of orthodontic treatment through a traditional brick-and-mortar model.

58.    In the collection of photographs, scans, and consumer information from over 200,000 consumers in California using SmileDirect's non-clinical, administrative DSO Services, SmileDirect's California Affiliated Dental Practice has not had a single incident or complaint arising from the taking of photographs or scans of a consumer's teeth and gums or from the collection of health and dental information.

59.    The convenience of the SmileDirect telehealth platform is especially important for consumers who live in a California county without an orthodontic office—almost one-quarter of all

weintraub **tobin** chediak coleman grodin
law corporation

California counties. By using SmileDirect's telehealth platform, those consumers can avoid traveling long distances to attend multiple, unnecessary in-office appointments (which is also true of consumers in counties with an orthodontic office).

**IV.     Perceiving SmileDirect's Innovative Model as a Competitive Threat to Their Traditional Practices, the Dental Board Members Misread California Law in a Way that Targets the Telehealth Industry**

60.     Under the California Dental Practice Act, Cal. Bus. & Prof. Code § 1600 et seq. (the "Dental Act"), the Board regulates and enforces standards for the practice of dentistry in California. The Dental Act defines "dentistry" as "the diagnosis or treatment, by surgery or other method, of diseases and lesions and the correction of malpositions of the human teeth . . . ." *Id.* § 1625. The Board also regulates the standards for dental assistants in California. *Id.* § 1611. The Board exercises enforcement authority over licensed dentists and dental assistants in California. *Id.* §§ 1601.1(c), 1611. However, the Board does not have authority to regulate dental support organizations or activities that do not constitute the practice of dentistry.

61.     The Board consists of fifteen members. The Dental Act requires that the members of the Board include eight licensed dentists, one registered dental hygienist, one registered dental assistant, and five public members. *Id.* § 1601.1(a). Licensed dentists thus constitute a majority of the Board. Direct licensees of the Board—dentists and dental assistants—hold nine Board seats, and those who practice or work in the dental industry (dentists, dental hygienists, and dental assistants) hold ten seats.

62.     Although traditional dental and orthodontic practices in California have benefited from SmileDirect's marketing that has raised the awareness of the importance of straight teeth and the availability of clear aligners as an alternative to braces, those traditional practices, including the dental practices of the Board Members, view SmileDirect's entry into the California market as a competitive threat. Many, if not all, of the dentists on the Board have prescribed clear aligners using the traditional business model. Clear aligner providers such as Align Technology, Inc., the maker of Invisalign, enable general practice dentists to prescribe and treat their patients with clear aligner therapy upon completion of a certification course; dentists may treat patients with Invisalign, for

example, upon completion of training provided through a one-day virtual course. This means that all the dentists on the Board can prescribe clear aligners, making their practices directly in competition with Treating Doctors who use the SmileCheck platform to serve California consumers. Several Board Members have dental practices physically located near SmileShop stores.

63.    In response to SmileDirect's competitive threat, trade associations comprised of SmileDirect competitors, including the California Dental Association and the American Association of Orthodontists, spurred the Board to pursue an aggressive, anti-competitive campaign of harassment and intimidation against SmileDirect and its Affiliated Dental Practices and Treating Doctors. This campaign began with statewide raids of SmileShops and unwarranted and burdensome information requests designed to intimidate, harass, and disrupt the business of SmileDirect and its Affiliated Dental Practices and Treating Doctors.

64.    Next, the Board and its trade association allies attempted to have legislation passed targeting telehealth models for delivery of clear aligner therapy. With the Board's authorizing statute set to expire at the end of 2019, the legislature needed to extend that authorization to allow the Board's continued existence, and a sunset bill was proposed, AB1519, which would have simply extended the Board's authorization. The Board and the trade associations, however, tried to pack into the otherwise non-controversial sunset bill, substantive statutory amendments targeting only the clear aligner telehealth industry. Before AB1519 made it to Governor Newsom's desk, the substantive contents of the bill were narrowed—the Board did not get everything they wanted. But the Board's devious intent was clear. By adding the substantive revisions into the sunset bill, the Board forced Governor Newsom into a bind: sign the law, including the substantive amendments to the Dental Act, or the Board would cease to operate. In his signing statement, Governor Newsom voiced his displeasure with the Board's tactic: "While I am signing this legislation, sunset bills are not the appropriate vehicle for policy changes that lack broad stakeholder input. Such proposals should be considered in separate legislation and evaluated accordingly. I will not look favorably upon any future regulatory sunset bills that include those provisions."

///

///

65. The primary substantive amendment to the Dental Act added by AB1519 was a requirement that a treating dentist perform an "examination," including the review of the patient's most recent radiograph or other equivalent bone imaging suitable for orthodontia, before prescribing a treatment for misaligned teeth. *See* Cal. Bus. & Prof. Code § 1680(ah). That new law did not require (nor would any formal version of AB1519 have required) that the examination be performed in-person. This meant that although AB1519 made some changes to the Dental Act, those provisions did not prevent dentists and orthodontists from using services like those provided by SmileDirect to treat patients through a fully remote model.[4]

66. Recognizing that its effort to eradicate telehealth models for treating misaligned teeth had thus far failed, the Board tried to go further. In 2020, the Board and its trade association allies backed a bill, AB1998, that would have added a single word into the recently enacted § 1680(ah). By adding "in-person" as a modifier of "examination," AB1998 would have required an in-person office visit before a licensed dentist could treat a patient with clear aligner therapy. That bill failed. So the law remains that no in-person visit is required.

67. Because of the Board's abusive conduct, SmileDirect, one of its Affiliated Dental Practices, and a Treating Doctor filed the Antitrust Action in October of 2019, which was styled *Sulitzer et al. v. Tippins et al.*, C.D. Cal., Case No. 2:19-cv-08902-GW-MAA. Having failed in its attempt to amend California law to require in-person visits, while the parties litigated the Antitrust Action, the Board reimagined existing California law in a way that would pose undue costs on telehealth providers and consumers who elect to receive care through a telehealth model. Specifically, the Board interpreted the Dental Act and corresponding regulations in several incorrect ways:

///

///

///

---

[4] For example, the enacted version of AB1519 added a requirement that telehealth practices identify the name and license number of the treating doctor, a requirement SmileDirect, Affiliated Dental Practices, and Treating Doctors comply with.

weintraub **tobin** chediak coleman grodin
law corporation

a.    Despite the legislature's refusal to add "in-person" to the statute through AB1998, the Board says dentists must conduct an in-person examination before prescribing clear aligner therapy, even though the law imposes no such requirement and the Board failed in its attempt to add the word "in-person" into the law;

b.    The Board says dentists must conduct a preliminary oral exam before a dental assistant or technician can take photographs using a digital scanner, even though taking photos with a scanner is not a "diagnostic procedure";

c.    The Board says dentists must directly supervise, onsite, any technician or dental assistant who uses a digital scanner to take photographs of a consumer's mouth and teeth, even though the relevant statute requires only "general" (i.e., not onsite) supervision.

d.    The Board says dentists cannot allow any non-dentist to participate in the development of a dental treatment plan, even though virtually all dentists and orthodontists who prescribe clear aligner therapy—including those practicing under the traditional brick-and-mortar model—use trained non-dentist technicians to assist in developing a treatment plan.[5]

68.    Given the formal position taken by the Board on these issues and the significant burden and cost the Board's interpretation of the law would impose on SmileDirect, Affiliated Dental Practices, Treating Doctors, and consumers, the parties to the Antitrust Action recognized that the dispute about the Board's positions on the requirements under the Dental Act were paramount. So the parties settled the Antitrust Action but did not settle the entire dispute. Under the

---

[5] The Board has formally taken additional positions under the Dental Act. First, the Board says that a treating dentist must, before diagnosis and correction of malpositions of teeth, review the consumer's "most recent diagnostic digital or conventional radiographs or other equivalent bone imaging suitable for orthodontia," or order new radiographs or imaging "when appropriate." That position is not in dispute here because consumers using SmileDirect's platform are prompted to provide a recent radiograph, and if none is provided, the Treating Doctor determines whether a new radiograph is necessary or appropriate. Second, the Board says that a dentist must form and document a diagnosis, create a treatment plan, and receive informed consent from the consumer. That position is not in dispute here because Treating Doctors fulfill each of these requirements. Third, the Board says that a corporation that is not registered as a professional dental corporation under California law cannot practice dentistry. SmileDirect agrees. It does not practice dentistry and instead provides only DSO Services.

settlement, the parties agreed that the Antitrust Action would be dismissed without prejudice, to be refiled after the parties obtained a judicial declaration resolving the dispute about the Board's positions on the requirements under the Dental Act. As part of the settlement, on June 8, 2023, the Board issued a letter to the plaintiffs, laying out the Board's formal positions under the Dental Act and corresponding regulations (the "Board Position Letter"). A copy of the Board Position Letter is attached and incorporated herein as **Exhibit A**. The parties' settlement contemplated that SmileDirect would bring this action for declaratory relief. The settlement also stipulated that the legal action could be brought in any state or federal court located in the State of California.

## CLAIM FOR RELIEF

### Declaratory Relief Under the California Dental Practice Act

69.    SmileDirect realleges and incorporates each allegation of the preceding paragraphs.

70.    Using the business model described herein, SmileDirect has conducted extensive business in California since 2017.

71.    The Dental Act and corresponding regulations govern various aspects of dental practice. The Dental Act restricts the practice of dentistry in California to licensed dentists, and it imposes various professional standards on dentists, dental assistants, and dental hygienists. The Dental Act and corresponding regulations specify certain practices, acts, and operations that may be performed only by a licensed dentist and practices, acts, and operations that may be performed by others, including dental assistants and dental hygienists. Under the Dental Act and corresponding regulations, some practices, acts, and operations that may be performed by someone who is not a licensed dentist require the supervision of a licensed dentist.

72.    Contrary to the formal position taken by the Board, California's telehealth law allows medical treatment to be provided through a telehealth format, and nothing in the Dental Act requires a diagnosis of clear aligner therapy to begin with an in-person dentist visit.

73.    Contrary to the Board's position, the use of a digital scanner to take photographs of a consumer's mouth and teeth is not a "diagnostic procedure," and thus "direct" supervision by a licensed dentist is not required.

///

weintraub **tobin** chediak coleman grodin
law corporation

74.     Contrary to the Board's position, the Dental Act does not require that a dentist first conduct an oral examination before photographs are taken using a digital scanner.

75.     Contrary to the Board's position, although a treating dentist maintains sole responsibility for choosing a treatment plan, the Dental Act does not prohibit a dentist from using the assistance of a technician in the process of the dentist's development of a treatment plan.

76.     A live controversy exists between the parties because the Board, a regulatory body overseeing the practice of dentistry in California, has taken positions under California law that, if accepted, would require significant changes in the business practices of SmileDirect, Affiliated Dental Practices, and Treating Doctors, thereby imposing immense financial burdens on SmileDirect, Affiliated Dental Practices, Treating Doctors, and, in turn, consumers in California.

77.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Accordingly, SmileDirect is entitled to a declaration that the Board's formal positions on the requirements of the Dental Act and corresponding regulations, as outlined herein, are incorrect.

## PRAYER FOR RELIEF

Wherefore, SmileDirect prays for the following relief:

(a)     For a declaration that California law does not require that a dentist conduct an in-person examination before prescribing clear aligner therapy;

(b)     For a declaration that the taking of photographs of a consumer's mouth and teeth with a digital scanner is not a "diagnostic procedure" under California law, and California law does not require that a dentist conduct an oral examination before a dental assistant or technician can take photographs using a digital scanner;

(c)     For a declaration that California law does not require a dentist to provide "direct" (i.e., onsite) supervision of a technician or dental assistant who uses a digital scanner to take photographs of a consumer's mouth and teeth.

///

///

///

(d)     For a declaration that California law does not prohibit a dentist from using a trained technician to assist in the dentist's development of a treatment plan.

(e)     For an award of costs allowed by law; and

(f)     For such other relief as is just and equitable.

Dated:  August 21, 2023                    **weintraub tobin** chediak coleman grodin
                                           LAW CORPORATION


                                           By:_____
                                               W. Scott Cameron

                                           Attorneys for Plaintiff SmileDirectClub, LLC

COMPLAINT FOR DECLARATORY RELIEF

EXHIBIT A

CALIFORNIA DEPARTMENT OF CONSUMER SERVICES AND HOUSING AGENCY  |  GAVIN NEWSOM, GOVERNOR
**DENTAL BOARD OF CALIFORNIA**
2005 Evergreen St., Suite 1550, Sacramento, CA 95815
P (916) 263-2300  |  F (916) 263-2140  |  www.dbc.ca.gov

June 8, 2023

**VIA EMAIL**

Jeffrey Sulitzer, DMD
Jeffrey Sulitzer, DMD, PC
SmileDirectClub, LLC
c/o James D. Dasso, Esq.
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654
jdasso@foley.com

Re:    *Sulitzer et al. v. Tippins et al.*, United States District Court, Central District of
        California, Western Division, Case No. 2:19-CV-08902 GW (MAAX)
        Position on Plaintiffs' Business Model

Dear Mr. Dasso:

The Dental Board of California (Board) has reviewed plaintiff SmileDirectClub's (SDC)
description of the operation of its business model. The Board cannot evaluate a
business model in the abstract, as the California Dental Practice Act (DPA) regulates
individuals in their particular practice of dentistry and the dental services they render
based on the needs of each particular patient. However, the Board takes the position
that all of the following violate the DPA, related regulations, and/or the minimum
standard of care:

   a.  A dentist allowing an unlicensed individual to develop a written dental treatment
       plan. (Business and Professions Code (BPC), §§ 1680, subd. (c), 1684.5, subd.
       (b); 1701, subd. (f), and 1750.1, subd. (f)(1); California Code of Regulations
       (CCR), tit. 16, § 1085, subs. (a)(1).)

   b.  An unlicensed dental assistant, without direct dentist supervision, taking iTero
       scans of patients for intraoral impressions for nonprosthodontic appliances and
       performing measurements for the purpose of orthodontic treatment. (BPC, §
       1750.1, subd. (b)(3) and (8); CCR, tit. 16, § 1085, subs. (c)(1) and (9).)

   c.  Failure by a dentist, prior to diagnosis and treatment, to conduct an in-person
       examination of a patient, including periodontal examination and oral cancer
       screening, or review documentation of a preliminary in-person examination
       performed by a registered dental hygienist, registered dental hygienist in
       alternative practice, or registered dental hygienist in extended functions under
       general dentist supervision, or a registered dental assistant in extended functions

13294\001\9507438.v1

Jeffrey Sulitzer, DMD
Jeffrey Sulitzer, DMD, PC
SmileDirectClub, LLC
c/o James D. Dasso, Esq.
June 8, 2023
Page 2

      licensed on or after January 1, 2010 under direct supervision. (BPC, §§ 1680, subd. (ah), 1684.5, 1753.5, subd. (b)(1), 1908, subd. (a), 1910, subd. (a), 1911, subd. (a), 1921, 1925, and 1926; CCR, tit. 16, §§ 1088, subs. (c)(5), 1089, subs. (b), and 1090, subs. (b).)

d.  Failure by a dentist to conduct a preliminary oral examination prior to permitting an unlicensed dental assistant to perform diagnostic procedures, which include taking iTero scans of patients for intraoral impressions for nonprosthodontic appliances. (BPC, § 1684.5, subd. (a).)

e.  Failure by a treating dentist, prior to the initial diagnosis and correction of malpositions of human teeth or initial use of orthodontic appliances, to review the patient's most recent diagnostic digital or conventional radiographs or other equivalent bone imaging suitable for orthodontia, or failure to order new radiographs or other equivalent bone imaging when appropriate. (BPC, § 1680, subd. (ah).)

f.  Failure of a treating dentist to form and document a diagnosis, create a written treatment plan, and receive informed patient consent, after the patient has been advised of the risks and benefits of the patient-specific treatment and treatment options. This must occur prior to authorizing construction by a third-party of an orthodontic appliance. (BPC, §§ 1626, subd. (e), 1680, subd. (ah), and 1684.5; Health & Saf. Code, § 123100 et seq.)

g.  The practice of dentistry by a corporation that is not registered as a professional dental corporation pursuant to Corporations Code sections 13400 et seq., and in compliance therewith pursuant to Business and Professions Code section 1800.

Sincerely,

Tracy A. Montez, Ph.D.
Executive Officer